Filed 5/31/13  M.R. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| M.R.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SANTA CLARA COUNTY,<br><br>    Respondent,<br><br>SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>    Real Party in Interest. | H039423<br>(Santa Clara County<br> Super. Ct. Nos. JD020463,<br> JD19825) |

## I.  INTRODUCTION

Petitioner M.R. is the mother of A. and J., the young children at issue in this juvenile dependency case.  She has filed a petition for writ of mandate seeking review of the juvenile court's orders terminating her reunification services and setting a Welfare and Institutions Code section 366.26[1] permanency planning hearing.  In her petition, the mother argues that the juvenile court erred because there is no substantial risk of

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

detriment in returning the children to her since (1) she has complied with the case plan; (2) there is no substantial evidence of domestic violence; (3) there is no substantial evidence that she has a substance abuse problem; and (4) there "have not been enough hearings" to support the finding of detriment.

For the reasons stated below, we determine that the juvenile court properly conducted an 18-month permanency review hearing pursuant to section 366.22, subdivision (a), although not all of the six-month and 12-month interim review hearings had been held for either A. or J. We also determine that the mother has not shown that the juvenile court's findings and orders are not supported by substantial evidence. Therefore, we will deny the writ petition.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The Mother's Children*

The mother has five sons (R., F., P., A., and J.) with three different fathers. The father of R., age 17, is deceased. The father of F. and P., ages 11 and 10, is the mother's former husband, J.M. The mother's current husband, B.R., whom she married in 2010, is the father of her two youngest children, A., age three, and J., age two. All five children have been the subject of dependency proceedings.[2] A. and J. are the only children at issue in this writ proceeding. Their father has not sought writ review.

### B.  *Prior Related Appeals*

The mother began receiving informal supervision services in lieu of court intervention from the Department of Family and Children's Services (the Department) in February 2009. At that time, there were at least eight prior child abuse and neglect

---

[2] The Department's request for judicial notice of the record in a related appeal, *In re Robert H.* (Jul. 22, 2011, H035646, H035948) [nonpub. opn.] (*Robert H.*), is granted. (Evid. Code, § 452, subd. (d)(1).) On our own motion, we take judicial notice of our prior opinion in *Robert H.*, *supra*, H035646, H035948. Our summary of the factual and procedural background includes some information that we have taken from the prior opinion.

referrals involving the mother's four oldest sons that were substantiated for physical abuse, caretaker absence/incapacity, emotional abuse, substantial risk of sexual abuse, and general neglect. Among other things, the mother had abused prescription pain medication and was in a methadone maintenance program.

During the period of informal supervision, the mother's eldest son, R., was involved in violent incidents in the home. The mother reported that in September 2009 she saw R. shake A. with force when A., who was then a baby, would not stop crying. R. and the mother had a physical altercation, also in September 2009, in which R. attempted to choke the mother and she bit, scratched, and slapped him.

The Department subsequently filed a petition under section 300, subdivision (b) (failure to protect) as to R. and he was placed in protective custody. In October 2009 the Department filed petitions under section 300, subdivisions (b) (failure to protect) and (j) (abuse of a sibling) as to R.'s younger brothers F., P., and A. At the time of the contested jurisdiction hearing held in April 2010, the mother was receiving in-home support and guidance in the parenting of her sons.

After the contested jurisdiction hearing concluded, the juvenile court found true all but one of the allegations in the section 300 petitions and ordered that the mother was to retain custody of the children with family maintenance services; J.M. was to have separate family maintenance services for his sons F. and P.; and B.R. was to have reunification services for his son, A. The juvenile court found that "without the court's intervention, these children would be at risk in that it is not for a lack of knowledge from the parents, but it is from a lack of follow through . . . the chances [that] this family would succeed as a unit would be very, very difficult to achieve and there could be [a] further injury or risk of harm, both physical and emotional to these children."

In May 2010, A.'s father, B.R., was released from custody on parole, but he was remanded about a week later due to a parole violation that occurred during a traffic stop. Although B.R. is a registered sex offender who is prohibited from contact with children,

3

he was found in a car with the mother and A. After B.R.'s remand, his parole agent found baby food, clothing, and diapers in B.R.'s motel room.

About one month later, the Department filed section 387 supplemental petitions[3] as to all four boys and they were placed into protective custody. Amended section 387 supplemental petitions were later filed and, after a hearing, R. was released to his mother. In August 2010, the jurisdiction/disposition hearing was held. The juvenile court found the allegations in the section 387 supplemental petitions to be true and in its August 5, 2010 disposition order adopted the Department's recommendations that R. remain with his mother with family maintenance services and that F. and P. remain with their father, J.M., with family maintenance services.

A contested disposition hearing was then held as to A. The juvenile court found by clear and convincing evidence that A. should not be returned home, stating: "[Mother] did not take responsibility, still makes excuses. There was convenient explanations that totally tried to devoid herself of any responsibility for bringing this case back in to court, instead of following through with the case plan as had been set in place. [¶] . . . [¶] It is clear that both parents are willing to undertake risks at the expense of these children." The August 6, 2010 disposition order placed A. in foster care with family reunification services for the mother and B.R.

The mother appealed and on July 22, 2011, this court affirmed the August 5, 2010 disposition order as to R., F. and P. (*Robert H.*, *supra*, H035646, H035948.) The August 6, 2010 disposition order regarding A. was reversed and the matter was remanded to the juvenile court with directions to order the Department to provide proper notice to

---

[3] Section 387, subdivision (a) provides: "An order changing or modifying a previous order by removing a child from the physical custody of a parent . . . and directing placement in a foster home . . . shall be made only after noticed hearing upon a supplemental petition."

the Apache tribes pursuant to the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).  (*Robert H*., *supra*, H035646, H035948.)

Having reviewed the prior related appeal, we turn next to a review of the subsequent interim review proceedings regarding A., followed by a review of the dependency proceedings regarding J.

**C.  *Interim Reviews Regarding A.***

**1.  Six-Month Review**

The Department's six-month status review report was filed in May 2011.  At that time, 19-month-old A.  remained in the foster home where he had been placed following his removal from the mother in June 2010.  A. was reported to be healthy, happy, bonded with the foster mother, and making "excellent developmental progress in foster care."  In December 2010 A. began unsupervised visits at his parents' home.  However, after the mother gave birth to J. in early 2011 and A.'s father, B.R., admitted his unauthorized use of methadone, the social worker recommended that A.'s visits be supervised.

The services that the Department had provided to the family during the review period included monthly contacts with A., his parents, and his care providers; telephone contact with the mother's therapist; consultation with the mother's Housing Authority and CalWorks workers; referral of the mother to parenting class, domestic violence assessment and therapy; referral of the mother for a psychological evaluation; telephone contact with the mother's counselor at the methadone clinic; referral of B.R. for a DADS assessment, parent orientation, basic parenting class, outpatient treatment and domestic violence assessment; monthly bus passes for the parents; and obtaining funding for outpatient drug treatment services for B.R.

By May 2011, the mother had completed a parenting without violence class, had received individual counseling, and had completed a domestic violence assessment.  She had also undergone a psychological assessment by Dr. Robert Mulcahy, who reported that the mother would be in a better position to engage in reunification services once she

5

had demonstrated an ability to get "her depression and anxiety under control and by being a consistently effect[ive] parent with the children who are already in her care." The mother was continuing to receive daily doses of methadone and her weekly drug tests had been negative.

The Department determined that it was not in A.'s best interest to be returned to his parents' care in May 2011 because B.R. had refused to participate in either drug treatment, AA/NA meetings, or a batterer's program, and the mother had reported that B.R. verbally and emotionally abused her. Additionally, both parents were overwhelmed by caring for a baby, J., and teenager, R., in their home. The Department therefore recommended that the parents be provided with an additional six months of family reunification services and that A. remain in the foster home.

A six-month status review hearing was held on May 27, 2011. The minute order for May 27, 2011, indicates that the juvenile court ordered additional reunification services for the mother and terminated reunification services for the father, B.R.

### 2. 12-Month Review

The record reflects that the Department filed a 12-month status review report regarding A. on August 3, 2011. That report was not included in the record on appeal. The addendum report filed on August 31, 2011, in connection with the 12-month review included the Department's recommendations that the mother be provided with an additional six months of family reunification services and that A. remain in the foster home. The social worker was concerned that the mother was receiving weekly therapy with a therapist from Community Solutions but the therapist had not provided sufficient information for the social worker to make an assessment regarding reunification.

A 12-month review hearing was set for August 31, 2011. The hearing did not go forward because this court had reversed the August 6, 2010 disposition order regarding A. and remanded the matter to the juvenile court with directions to order the Department to provide proper notice to the Apache tribes pursuant to ICWA. (*Robert H*., *supra*,

6

H035646, H035948.) A disposition hearing on remand was set in October 2011 with the 12-month status review trailing. The Department requested a continuance to receive responses from all noticed tribes and the disposition hearing was continued to November 16, 2011. At the continued disposition hearing, the juvenile court determined that ICWA did not apply and reinstated the disposition orders of August 6, 2010.

A.'s parents apparently did not agree with the Department's recommendations and at the trial-setting hearing held on November 21, 2011, the juvenile court set the matter for mediation on January 9, 2012. No resolution was reached during mediation and a trial-setting hearing on the 12-month review was held on January 23, 2012. Trial management conferences were then held in February and March 2012. At the March 2012 trial management conference, the Department requested a continuance "to expand visitation and assess for a possible change in recommendation to return of the children to the mother."

In April 2012, the Department requested another continuance due to the social worker's unexpected absence. In May 2012 the Department changed its recommendation to recommending the return of A. and J. to the mother. The juvenile court set a mediation in June 2012 regarding their return. However, the record reflects that on May 9, 2012, a referral was made to the Child Abuse and Neglect Center alleging that the mother drove the children while she was impaired. By the time the mediation was held in June 2012, the Department had changed its recommendation again and was now recommending that the juvenile court terminate reunification services to the mother and set a section 366.26 permanency planning hearing. No agreement was reached at the mediation and a trial was set in September 2012.

D. *Pre-Trial Dependency Proceedings Regarding J.*

1. **Section 300 Petition**

The Department filed a petition under section 300, subdivisions (b) (failure to protect) and (j) (abuse of a sibling) as to J. in January 2011, when he was a few days old.

7

In the petition, the Department alleged that J. needed juvenile court supervision because he was at risk of neglect, physical and emotional harm, and sexual abuse in the care of his parents.

In February 2011, the Department applied for a protective custody warrant. The application stated that J.'s safety in the parents' home had "decreased dramatically" because the father. B.R., had stopped participating in reunification services and had refused services to address substance abuse, domestic violence, and sex offender treatment. According to the mother, B.R. had been emotionally abusive to her. Additionally, J. had been exposed to methadone in utero and had several health problems for which the mother had refused public health nurse services. A warrant issued and J. was taken into protective custody. At the time the protective custody warrant was executed, the social worker entered the home and found marijuana plants growing.

### 2. Initial Detention Hearing

The Department filed an initial detention hearing report in February 2011 that recommended continued detention of J. with his brother A. in their foster home. The report stated that B.R. was a registered sex offender due to sexually abusing his daughter and he had "an extensive criminal history for acts of violence, sexual abuse, and drug abuse and failure to comply with parole conditions." B.R. had continued to decline to participate in either court-ordered sex offender treatment or a domestic violence class and the mother had reported that B.R.'s emotional abuse of her had increased. The mother was participating in services, but she had denied that she had a problem with prescription drug abuse (although that was the reason she was on methadone), denied that contact with B.R. placed her other children at risk, and disagreed "adamantly" with the psychological evaluation that she put her own needs ahead of the needs of her children.

At the initial detention hearing held on February 28, 2011, the juvenile court ruled that continued detention was necessary to protect J. and placed him temporarily in the foster home. The court also ordered supervised visitation for both parents.

8

### 3. Jurisdiction and Disposition

The Department filed addendum reports in connection with the contested jurisdiction hearing that recommended the continued detention of J. After the contested jurisdiction hearing was held in March 2011, the juvenile court found that the allegations of the amended section 300 petition were true and set a disposition hearing.

At the disposition hearing held in April 2011 the juvenile court kept all prior orders in effect and set the matter for mediation. The mediation was unsuccessful and another disposition hearing was held in May 2011. The Department filed an addendum report recommending that J. be made a dependent of the court and that family reunification services be offered to the parents.

A later addendum report recommended that reunification services for J.'s father, B.R., be terminated. The reason for the change in recommendation was that an altercation between the mother and B.R. had occurred on May 12, 2011, in which B.R. became enraged, spat in her face, and killed the family's puppy by throwing it against a wall. B.R. later turned himself in to law enforcement and charges for animal cruelty and domestic violence were pending. However, the mother defended B.R. and stated that the puppy's death was an accident. The social worker was concerned that the mother did not recognize domestic violence and had resisted attending a domestic violence support group.

On May 27, 2011, the juvenile court declared J. a dependent of the court and ordered the mother to participate in and complete services, including counseling or psychotherapy, participating in a 12-step program or other substance abuse program, undergoing a substance abuse assessment if the social worker or methadone counselor reasonably suspected methadone or other drug abuse, receiving methadone treatment as recommended by the methadone clinic, developing an aftercare relapse prevention plan, and attending a domestic violence survivor's support group or individual domestic

9

violence counseling.  B.R. was also ordered to participate in and complete services, including a parenting class and a substance abuse parenting class.

### 4.  Interim Status Review

The Department filed an interim review report in August 2011.  At that time, J. remained in his foster home placement with his brother A.  J. had been assessed, was found to have developmental delays likely due to drug exposure in utero, and physical therapy was recommended.  His father, B.R., was incarcerated and had not participated in any reunification services.  The mother was already participating in the services ordered in J.'s siblings' dependency cases and had not attended AA or NA meetings.  She had participated in court-ordered visitation.  However, the social worker was concerned that R., the mother's oldest son who resided with her, had been verbally and physically abusing the mother, had indirectly threatened her, and was sleeping with a screwdriver under his pillow.  The Department recommended a slow transition of J. to the mother's care, consisting of unsupervised visits progressing to overnight visits, since she was not prepared to care for a small infant with developmental delays and many medical appointments.

An interim review hearing was held in October 2011.  The juvenile court kept all prior orders in effect and directed that ICWA compliance was to follow the six-month review hearing.

### 5.  Six-Month Review and Pretrial Proceedings

A six-month review hearing was set in November 2011.  The juvenile court continued the matter for trial setting of a contested six-month review hearing.  At the trial setting hearing, the court set the matter for mediation in January 2012, which was unsuccessful.

Thereafter, two early resolution conferences regarding A. and J. were held in April and May of 2012.  On May 9, 2012, a referral was made to the Child Abuse and Neglect Center alleging that the mother had driven the children while she was impaired.  Another

10

unsuccessful mediation was held in June 2012. At that time, the Department changed its recommendation to recommending termination of reunification services for both A. and J. and the setting of a section 366.26 permanency planning hearing.

In August 2012, the juvenile court issued its order finding that ICWA did not apply to J. The matter then proceeded to trial regarding both A. and J. in September 2012, as described below.

**E.** *September 2012 Trial Regarding A. and J.*

**1. Trial Briefs**

The Department stated in its trial brief that the statutory maximum time period for reunification services had expired as to both A. and J. and therefore the juvenile court's only options were (1) to return the children to the mother; or (2) terminate reunification services and set a section 366.26 permanency planning hearing. The Department asserted that the evidence would show that the return of A. and J. to the mother would be detrimental to their safety, protection, or physical or emotional well-being and therefore requested that the reunification services be terminated and a section 366.26 hearing be set.

The minor's counsel submitted a brief requesting that the juvenile court treat the trial as an 18-month hearing, find that return of A. and J. to the mother's home would create a substantial risk of detriment, terminate the mother's reunification services, and "clear [A.] and [J.] to be adopted by their long-term Foster Parents." The minor's counsel stated: "Mother continues to display poor judgment, make poor decisions, ignore court orders, put her children in danger, and expose them to domestic violence."

In her trial brief, the mother disagreed with the Department's recommendations. She asserted that the evidence was insufficient to show that return of A. and J. to her would create a substantial risk of detriment because she had substantially complied with her case plan and had alleviated the conditions that led to their removal. She sought immediate return of the children.

11

## 2. Trial Stipulations

On the first day of trial, the juvenile court inquired about the delays in the case that had led to the expiration of the 18-month reunification periods for both A. and J. without all of the interim review hearings being held. By the trial's conclusion, the parties agreed that the only interim review hearing that had been held was A.'s six-month review hearing.

The parties also agreed that the trial court would be conducting a combined 18-month review hearing for A. and J. As to the issues to be determined at the hearing, the parties clarified that a trial issue was whether the court had the authority to extend reunification services for six additional months, as the mother contended. The trial court confirmed, after trial testimony concluded, that counsel had agreed that the trial was an 18-month review that "essentially subsumed" the other interim review hearings.

The parties submitted a posttrial "Stipulated Factual and Procedural History" that outlined the juvenile dependency proceedings that had taken place with respect to the mother's five children, including A. and J. The stipulation stated that the 18-month period that ran from the time A. was taken into protective custody expired on December 18, 2011, and that the 18-month period that ran from the time J. was taken into custody expired on August 23, 2012.

A brief summary of the testimony given at the eight-day September 2012 trial follows.

## 3. Trial Testimony

### *Priscilla Ribeiro*

The Department's chief witness was Priscilla Ribeiro, a social worker who was assigned the case of A. and J. in December 2009. Her recommendation was that the juvenile court terminate reunification services to the mother and set a section 366.26 permanency planning hearing for both children.

12

The basis for Ribeiro's recommendation was her opinion that the safety and well-being of A. and J. would be at risk if they were returned to the mother due to (1) the "long standing volatile relationship" between the mother and her oldest son, R., who lived with the mother; (2) the mother's long history of making poor decisions that placed her children at risk; and (3) the exposure to emotional abuse in the relationship between the mother and B.R., which was demonstrated by numerous incidents in which the police were called due to verbal and physical domestic violence.

Regarding R., Ribeiro had received information that physical and verbal altercations between the mother and R. had occurred, that R. had begun sleeping with a screwdriver under his pillow, and the mother had stated that she was concerned for her own safety in the home.

As to the mother's poor decisions, Ribeiro was particularly concerned about the May 9, 2012 incident in which the mother drove with A. and J. in the car even though she was under a court order not to drive since she did not have a driver's license. On that day, R. had an appointment at Community Solutions. The mother drove R. to the appointment with A. and J. in the car. While they were at the appointment, the Community Solutions intake worker noticed that the mother had fallen asleep and he had to wake her up during the intake process to ask her questions. Mother also slept while A. was flicking the lights on and off and J. was screaming. R. informed the intake worker that the mother sometimes fell asleep while driving him. When Ribeiro questioned the mother she denied that she had driven while she was feeling drowsy.

Another poor decision, according to Ribeiro, was the mother's decision to allow B.R. to have contact with the children, beginning in May 2010, in violation of a court order prohibiting him as a registered sex offender from having contact with all of the children except A. Contact with A. was allowed only if permitted by B.R.'s parole officer.

13

Ribeiro further testified that the most recent incidence of domestic violence between the mother and B.R. was the altercation in May 2011 in which B.R. killed the family's puppy. After that incident, the mother informed the Department that B.R. was no longer living in her home. However, the mother admitted to the social worker that B.R. had brought his laundry to her home and took showers and ate there. Also, several Department staff members had seen B.R. taking the trash out. Ribeiro was concerned that the mother had minimized the effect of the puppy killing on the children and had denied that any physical abuse took place during that incident, which contradicted her statements to police that B.R. had physically restrained her, spat on her, and thrown items at her.

The services provided to the mother by the Department have included services designed to address domestic violence in the home and substance abuse. The mother had completed a parenting without violence parent education class. She was also referred to an individual therapy program treating domestic violence after she was not allowed to return to group domestic violence counseling because she left early, was disrespectful, and was taking notes. The mother also underwent a domestic violence assessment.

However, the mother had not complied with the court's order in J.'s case to participate in AA and/or NA meetings, to obtain a sponsor, to prepare a relapse prevention plan, and undergo a substance abuse assessment if there was a reasonable suspicion that she was abusing methadone or drugs. The mother informed Ribeiro that she could not participate in AA or NA because she was on methadone treatment and did not believe she was an addict.

Additionally, the mother was referred to and was participating in mental health counseling. She had also received the assistance of a parent advocate and a parent partner. The parent advocate supported the mother's participation in reunification services by, among other things, providing transportation to meetings and other services and assisting her to navigate the legal system. The parent partner helped the mother to

utilize the services of Eastfield Ming Quong (EMQ) for R. and to parent R. Ribeiro met with the mother at least once a month and they had numerous telephone conversations, plus weekly visits when there were problems such as R. becoming "more volatile."

The mother also had visitation with A. and J. while they were in foster care. By May 2012, Ribeiro had recommended to the juvenile court that A. and J. be returned to the mother's care. At that time, the mother was receiving services and R. "appeared to have settled a little bit more." However, Ribeiro changed her recommendation to termination of reunification services after the May 9, 2012 incident in which the mother drove with R., A., and J. in the car when she was drowsy. Ribeiro explained that the incident "[could not] be taken in a vacuum. It was not just one single incident. It was the . . . most recent example of [the mother's] long history of making poor choices that places [the three children at risk of harm.]" There were also incidents in which the foster mother or a social worker had transported the children from daycare to the mother's home and had difficulty getting the mother to come to the door.

Ribeiro was also concerned that the mother had minimized the effects of being drowsy, had denied feeling drowsy while driving on May 9, 2012, and had stated that the Community Services intake worker lied about her being sleepy at the intake process. According to Ribeiro, the mother "has a long history of not providing accurate information to the Department, and based upon all the information that [Ribeiro] was receiving from the investigative narrative, as well as interviews and [her] own conversations with [the mother], [Ribeiro] did not believe that [the mother] was . . . providing [Ribeiro] with the truth."

Further, Ribeiro determined that the mother had been provided with more than three years of numerous services, from "the parenting without violence to [domestic violence] services . . . and, yet, she still continues to make choices that places her children at risk, contrary to all the tools that she had been provided during the three years of services." Ribeiro believed that the mother did not understand how her choices and

behavior had impacted the children.  It was also very significant to Ribeiro that A. and J. were toddlers who could not protect themselves when violent physical or verbal altercations occurred in the home.

Ribeiro did not agree with the mother's claim that Ribeiro had hindered her reunification with A. and J. by promoting adoption.  Ribeiro is under a "concurrent mandate" to discuss concurrent planning with the parents when a child is removed from the home, meaning a discussion of what would happen to the children if they did not reunify with the parents.  For that reason, she had discussed with the mother the possibility of adoption for A. and J.

The meeting at a restaurant in 2011 between the mother, Ribeiro, and the foster parents took place at the mother's request.  Earlier, Ribeiro had told the mother that the foster parents were interested in adopting A.  During the restaurant meeting, the mother told the foster parents that she had been talking with the bishop of her Mormon Church ward about adoption and she asked them questions about their religion and ethnicity.  Ribeiro's only participation in the meeting was to stop the foster mother from disclosing too much personal information.  Sometime later, the mother informed Ribeiro that she did not want to have A. adopted.

### *Robert Freitas*

Robert Frietas is a case manager for Community Solutions, where his duties include handling the intake of new clients who are being provided with mental health and/or drug treatment services.  On May 9, 2012, R. had a 10:00 a.m. intake appointment at Community Solutions.

Frietas spoke with the mother twice on the morning of the May 9, 2012 appointment.  At approximately 8:50 a.m., Freitas called the mother to confirm the 10:00 a.m. appointment.  The mother told him that she did not remember the appointment, but she could make it on time after picking up R. from school.  She also said that she had her two younger children with her.  At 10:20 a.m., Freitas called the

16

mother again to find out if she was on her way. The mother responded that she was in the car and should not be driving with her two younger children, but she would be there as quickly as she could after picking up R. The mother did not ask to reschedule the appointment.

At 11:00 a.m., the mother arrived with R. and her two younger children, A. and J. When they arrived, the mother told Freitas that she was taking a "psych medication" that made her drowsy. The intake appointment then began with all of them sitting at a table. While Freitas was explaining the services to the mother and telling her what forms needed to be signed, the mother was falling asleep. While she was asleep, one of the younger children was dumping all the toys from the toy cabinet on the floor and flicking the lights on and off. The child in the stroller was crying and screaming.

Freitas would repeatedly wake the mother up, she would respond, and when Freitas looked down to fill out information in a form, she would fall asleep again. R. answered some of the questions and turned the lights back on after one of the younger children turned them off. Freitas took R. into another room to talk to him about his mother's behavior. R. told him that her medication made her drowsy and stated, "sometimes she nods off while she is behind the wheel at stop lights and stop signs, and I have to wake her up."

Freitas then contacted his supervisor, who suggested that the mother have a friend or family member pick her up and told him to call police if the mother refused and left to get in her car. The supervisor also stated that they would need to file a Child Protective Services (CPS) report. Frietas informed the mother that it would not be safe for her to drive home and asked if she could find alternative transportation. The mother's response was that she would walk home. She also told Freitas that she did not have a driver's license and that R. did not have to wake her up when A. and J. are in the car. Freitas denied that he had told the mother that she was " 'on the nod,' " which is a phrase used with regard to heroin addicts and has a negative connotation.

17

### *Sarah Stodghill Haggis*

One witness, Sarah Stodghill Haggis, was called on behalf of the minors. Haggis has a master's degree in clinical psychology and is a licensed marriage and family therapist. She is a clinical supervisor at Starlight Community Services and also contracts with the Dependency Advocacy Center, which represents parents and children. The minors' counsel retained her in this case. After voir dire, the juvenile court qualified Haggis as an expert in risk assessment services.

In this case, Haggis spoke with Ribeiro, the Department's social worker, as well as Amy Weingarten, the social worker retained by the mother's attorney. She also met with the mother three times. Haggis formed the opinion was that it would not be appropriate to return A. and J. to their mother at this time. Her opinion was based on the lack of consistent progress in visitation to unsupervised visitation; significant concerns about R.'s "struggles with some emotional regulation issues" that were scary for young children; and the incident in which the mother drove with the children to Community Solutions, although there was a court order for her not to drive, and CPS was called because the mother was sleeping.

Haggis was concerned that the mother lacked the ability to make decisions in the best interests of her children, especially when she was under the stress of parenting two toddlers. She also pointed to the mother's relationships with men that involved domestic violence and the elements of domestic violence in her relationship with R., which indicated that the mother was making decisions that were not in the best interest of her children.

However, Haggis found that the mother's home was safe for the children and had age-appropriate activities and furniture, the mother had developed some insight, and she had a strong support system in her church. Haggis recommended that R. receive additional services, that the mother engage in "trauma-based individual work" due to her own history of trauma, and that A. and J. receive play therapy.

18

### *Amy Weingarten*

Amy Weingarten is a licensed clinical social worker who works as a counselor for the Dependency Advocacy Center. She is employed by dependency attorneys, including the mother's attorneys in this case, and also works with the Department regarding the placement of dependent children. In this case, Weingarten has worked with the mother about two hours per week for the last two years. She has never observed the mother to be drowsy.

Weingarten wrote a May 2012 letter to the juvenile court and an August 2012 addendum stating her conclusion that A. and J. should be returned to their mother's care. She believes that the mother has demonstrated tremendous emotional growth during the past two years, is open to services, and is bright and willing to work hard.

As to R., Weingarten recalled that she had seen the mother and R. "go at it a few times" when they were angry with each other. The mother had improved their dynamic by talking to R. more and being less angry. Weingarten was not aware that an issue had been raised as to whether the mother could safely parent A. and J. due to the risk of domestic violence. However, Weingarten was concerned about the effect on A. and J. of exposure to the verbally aggressive relationship between the mother and R.

The mother's consistent contact with B.R., the man who abused her, is not a concern to Weingarten. She believes that the mother can provide a safe home for all of her children if services are provided, including First Five services for A. and J. and family therapy. In her opinion, the Department has not provided sufficient reunification services "[b]ecause there have not been any services to reunite the family." Weingarten also believes that Ribeiro had an adoption agenda.

Weingarten has experience as a methadone counselor and she would not recommend a 12-step program to a person receiving methadone maintenance because drug use of any kind would not be positively received in a 12-step program.

19

### *The Foster Mother*

The foster mother has been the foster parent of A. since he was 10 months old and the foster parent of J. since he was four weeks old.

Regarding the events of May 9, 2012, the foster mother understood that at that time the Department had expanded the visitation schedule for A. and J. to allow two days of consecutive visits. On May 9, 2012, the foster mother received a telephone call from the mother, who was crying and upset and asked to be picked up from Community Solutions. The mother told the foster mother that she needed a ride home because someone at Community Solutions had said she had nodded off.

The mother initiated conversations with the foster mother about adoption, but prior to the May 2012 court date the mother had said she did not want to consider the foster parents as adoptive parents because her husband said he would divorce her if she gave up the children for adoption. The meeting with the mother at a restaurant during the summer of 2011 occurred because Ribeiro, the social worker, called to tell the foster mother that the mother had requested a meeting with the foster parents. The mother asked the foster parent questions about their background, their family, and their religion. Ribeiro did not interrupt their conversation except to prevent the foster mother from giving out personal information about her address or where she worked. At present, the foster mother is willing and able to adopt both A. and J.

The foster mother had observed the mother to be drowsy three or four times. On one occasion, while the foster mother was conversing with the mother, the mother nodded off while she was holding baby J. On another occasion, the mother was asleep when the foster mother arrived to pick up A. and J. in the afternoon. Either F. or P. answered the door and took the foster mother to the mother's bedroom because they were having trouble waking her up. The foster mother found J. in the bed with the mother and A. with another brother on their bed. The foster mother also saw the mother nod off in the waiting room at a medical appointment for three or four minutes until she was woken

20

up by the children. The mother also told the foster mother that A. had gotten into his older brother's medication while the mother was asleep.

Regarding the mother's driving, the foster mother recalled that the mother had asked for a car seat and the foster mother gave her one. Although the social worker had told the foster mother than the mother was not supposed to drive with the children in the car, the foster mother thought that was an issue between the mother and the social worker. The foster mother had seen A. and J. in the car with mother on three occasions. However, she never told the mother to go ahead and drive.

During the spring of 2012, A. returned to the foster home in an extremely agitated state, telling the foster mother that something had happened and saying the word "bitch." The mother explained that there had been an altercation between herself and R. A. was also upset after an incident involving R. and the truancy officer. Following visitation with the mother, A. was sometimes upset and aggressive. When overnight visits with the mother started, A. did not want to go and on his return he would have nightmares and would not want to sleep in his own bed. He would also become clingy. These behaviors did not subside until the overnight visits ended.

### The Mother

The mother began a methadone maintenance program about three years ago, when she was pregnant with A. On her own initiative, she went to the methadone clinic and began taking methadone as an alternative to taking pain medication during her pregnancy. She believes that the prescription pain medication had been over-prescribed for pain resulting from an earlier pregnancy, and although she was dependent on the pain medication, she did not abuse it. At the time of trial, the mother was taking methadone every morning at the methadone clinic and had been approved for two home dosages. After taking the methadone, she feels a lessening of her minor aches and pains. Methadone only makes her feel drowsy if the dosage is too high.

The mother is also under the care of Dr. Nguyen, a psychiatrist at Community Solutions. She currently takes a medication, Lexapro, that Dr. Nguyen has prescribed for depression. She also takes Trazodone to help her sleep. Before taking Lexapro, she took Cymbalta for her depression, beginning in March 2012. A side effect of Cymbalta was that she would fall asleep when she was at a movie or reading a book.

On May 6 or 7, 2012, the mother did not take Cymbalta because she had forgotten to refill her prescription. She noticed that she was not drowsy and decided not to take any the next day, May 8. Since the mother did not feel drowsy on May 8, she believed the drowsiness was caused by taking Cymbalta. However, she did take Cymbalta on May 9, 2012, because she did not want to stop the medication without talking to the doctor.

Regarding the events of May 9, 2012, the mother stated that the foster mother had unexpectedly dropped off A. and J. early that morning. The mother had to take A. and J. with her when she traveled to the methadone clinic that morning by light rail and bus. While she was getting her methadone dose, she received a call from Frietas, the intake person at Community Solutions, reminding her of the appointment that day for R. She asked Freitas if she could reschedule because she had A. and J. with her, but he told her it was not a good idea and would not look good for her. While the mother was going home on the light rail she received another call from Freitas wanting to know if she was still coming to R.'s appointment. She was confused about the time of the appointment and thought it was later. The mother felt "very rushed" and that is when she decided to drive to the appointment. At that time, the mother had lost her driver's license due to unpaid traffic tickets.

The mother denied that she felt drowsy while she was driving R. to his appointment on May 9, 2012, with A. and J. in the car. She also denied that R. had to wake her up at any stop light. She did not feel drowsy until the middle of the intake appointment at Community Solutions, due to taking Cymbalta. The mother admitted that

22

she had driven while drowsy on prior occasions when R. was in the car, but stated that she would pull over and rest or go home. She had also driven with A. and J. in the car on another occasion when she did not have a current driver's license, in order to take them to the aquatic center. The foster mother had given the mother a car seat and told the mother that she would have more time to spend with the children if she drove.

During the summer of 2011, the mother's bishop suggested that she consider allowing the foster parents to adopt A. and J. The mother told Ribeiro about the conversation and Ribeiro asked her if she would like to meet the foster parents and ask them questions. The mother agreed and during the meeting with the foster parents at the restaurant, Ribeiro made comments that the mother interpreted as a threat that if she did not agree to adoption, she would never see her children again. Later that summer, Ribeiro told the mother that Ribeiro herself was adopted and it "was the best thing that ever happened to her in her life."

Regarding domestic violence, the mother believes that the Department has inaccurately characterized the domestic violence perpetrated by B.R. as physical when it was only emotional abuse. The incident in which B.R. killed the puppy occurred when B.R. came to the mother's home after he had been drinking and the mother pretended to call the police so that he would leave. B.R. got upset and put the puppy in a carrier. The mother screamed at him not to take the puppy and B.R. said, " 'You want the dog? Here is the dog,' " and threw the dog at her. The dog died after it hit the wall instead of the mother. She called the police to make sure that the situation did not escalate. Although R. was not physically involved in the altercation, the mother felt bad because R. saw the puppy die.

The mother believes that the puppy's death was an accident and the incident does not constitute physical domestic violence. She has maintained contact with B.R. during the one and one-half years that he has been incarcerated with monthly telephone calls.

She has also given him some money.  However, about one week before this trial started, the mother filed for divorce.

As to the domestic violence involving R., the mother admitted that their relationship had gotten physical at times.  About four years ago, an altercation occurred in which R. choked her and she scratched his arm.  According to the mother, there have been no physical altercations with R. since that time.  They have engaged in verbal altercations in which he called her a "bitch."  Another incident occurred when she called the truancy officer who came and put R., who was resisting the officer, in handcuffs while the younger boys were in the home.  The mother was holding J. at the time, who cried.  Another incident involved R. taking the car keys and threatening to leave.  However, the mother believes that when R. threatened to kill his teacher, that was only a jest.

The mother also believes that Ribeiro is biased against her since she has been mentioning adoption "since day one."  In the mother's view, Ribeiro has hindered the return of A. and J. by demanding more information from the mother's counselor than the counselor is legally allowed to provide and insisting that EMQ not provide her with financial assistance to pay the traffic tickets and get her driver's license back.  However, the mother acknowledged that she began having unsupervised visitation with A. and J. in March 2012 and that Ribeiro had recommended that they return home.

The mother also believes that the foster mother and Freitas lied during their testimony.  The foster mother lied when she testified that the mother had fallen asleep twice in the foster's mother's presence and that the mother had asked for the car seat.  Freitas lied when he testified that she was drowsy when she arrived for R.'s appointment at Community Solutions and fell asleep during the intake process.

According to the mother, since she has been taking anti-depressant medication her moods have improved and she has been making better decisions.  Her involvement in the Mormon Church has helped her self-image and given her a new family.  She has also

24

reduced her contact with B.R. while he is in prison by calling him to communicate about their children instead of visiting him.

*Dr. Nguyen and Dr. Stephenson*

Two physicians, Dr. Tao-Van Nguyen and Dr. Deborah Stephenson, testified on the mother's behalf.

Dr. Nguyen is a psychiatrist who has been treating the mother at the Community Solutions clinic since February 2012. He prescribed Cymbalta for treatment of the mother's depression, but on May 23, 2012, the mother complained of sleepiness during the daytime. Drowsiness is a side effect of Cymbalta. Dr. Nguyen changed the mother's prescription to a new medication, Lexapro, which has fewer side effects. He also prescribed Trazodone for the mother's insomnia. Dr. Nguyen is not aware of any potential side effects due to the mother combining antidepressant medication with methadone treatment. He would not prescribe methadone for pain management because of the potential for abuse of the drug.

Dr. Stephenson is board-certified in addiction medicine and is employed by the Santa Clara County Department of Alcohol and Drug Services. She has been prescribing methadone for the mother for approximately three years. In Dr. Stephenson's opinion, methadone treatment is restricted to people who meet the criteria for opioid dependence. In addition to taking methadone, a methadone treatment program involves counseling. Participation in recovery activities, such as a 12-step group, could be helpful. However, it is unusual for a patient to wean off methadone treatment and they are not encouraged to do so because it is very high risk. A patient on methadone can live a normal life and the treatment does not cause birth defects. Sedation is a side effect of methadone if the dosage is too high. Methadone may be prescribed for pain management only by a private physician outside the opioid treatment program.

The mother started methadone treatment due to dependence on prescription drugs and currently takes a daily methadone dose. During the past four months, she has been

given some doses to take at home.  Dr. Stephenson has not observed any interaction between the mother's methadone treatment and her Lexapro antidepressant medication. The mother discussed her drowsiness with Dr. Stephenson sometime within the past six months.

### *Jed Dyreng and Charles Thomas Wear*

Two Mormon Church members, Jed Dyreng and Charles Thomas Wear, testified on the mother's behalf.  Dyreng is the bishop in charge of a local Mormon Church congregation known as a ward and has a leadership role over the mother, whom he has known since December 2011.  The mother is a regular churchgoer and she has also participated in the church by teaching children and supervising female church members' monthly visits with each other.  Bishop Dyreng has also asked the mother to assist individual church members who needed help, which she has done.  Dyreng believes that that the mother is very capable and concerned about her children.  He has met all of her children except A. and J.

The Mormon Church has assisted the mother financially and R. has attended the church's scout camp.  Bishop Dyreng had a positive experience with R. when he took him to buy clothing.  On one occasion the mother called Bishop Dyreng for assistance when R. was arguing with her and she felt trapped.  However, R. was asleep when the bishop and his wife arrived at the mother's home.  In Bishop Dyreng's opinion, the mother takes very good care of her children and could take care of all five of them.

The mother asked Wear to testify as a character witness.  He has known the mother for about two and one-half years through the Mormon Church, where he was her "home teacher."  As a home teacher, Wear's role is to visit a family regularly to nurture and to teach.  If there is an incident or crisis in the family, the home teacher makes a report to church leadership.  Wear began visiting the mother's family as their home teacher shortly after A. was removed from the home.  He served as their home teacher for about 10 to 12 months.  He never observed the mother to be drowsy.

26

After A. was removed, Wear attended a proceeding about A. where he was shocked that the proceeding was about adoption.  The church was willing to help the mother with A. but the offer was rejected.  Wear believes that the mother is a very nurturing mother to A.  He observed that R. was "an angry child" who has raised his voice to the mother on multiple occasions, to which she responded calmly.

### R. and F.

Called as a witness on his mother's behalf, R., a high school sophomore, testified that he was attending school, doing okay, and his life was better now than a year ago.  The mother is a good mom because there is a roof over their heads and she feeds them.  His younger brothers F. and P. visit on weekends and he attends supervised visits with A. and J.  R.'s physical altercations with his mother include pushing her once when they were fighting.

R. denied telling Freitas at Community Solutions that his mother had fallen asleep while driving.  There were times when he was in the car with his mother and she closed her eyes for a second at a stop light and he tapped her to wake up.  She never did that when A. and J. were in the car, however.  His mother is "mostly awake" and taking care of things with the children.

F., age 11, also testified on his mother's behalf.  He and P., age 10, spend the night with their mother every weekend.  He has a lot of fun playing video games and horsing around with R.  He is not afraid that R. will hurt him.  His mother and R. have arguments, most recently a few days ago.  R. was angry and stormed off to his room.  F. has heard R. call his mother names.

F. testified that after the foster mother gave his mother a car seat, they drove to the aquatic center.  The mother does not drive with F. in the car any more.

### F.  *Statement of Decision*

After issuing a proposed statement of decision and receiving the mother's objections, the juvenile court filed its statement of decision and order on March 8, 2013.

The court ruled that (1) the Department had met its burden to show by a preponderance of the evidence that there is substantial risk of detriment to A. and J. if they are returned to the care of either parent; (2) the Department had demonstrated by clear and convincing evidence that reasonable services were provided; and (3) neither parent fell within any of the exceptions allowing for the extension of reunification services beyond 18 months from protective custody. The court therefore ordered that reunification services be terminated and set a section 366.26 permanency planning hearing. The court's factual findings in support of its rulings are briefly summarized below.

### 1. Reasonableness of Reunification Services

First, the court addressed the reasonableness of the reunification services that the Department had provided. Responding to the mother's contention that she has been deprived of meaningful review hearings for A. and J., contrary to legislative intent, the court noted that the parties had stipulated that the only review hearing that had taken place was the six-month review hearing for A.

However, relying on the decision in *Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501 (*Denny H.*), the court rejected the mother's contention that she had been deprived of meaningful review hearings and ruled as follows: "It is evident from the extensive procedural history . . . that the parties have had substantial contact with the court and services offered by the Department. There were frequent court appearances which provided the parties an opportunity to communicate and address issues as they arose both informally and through mediation and ERC. These events took place during the statutory time period where reunification services would be addressed albeit through a somewhat different procedure. This case does not present a situation where Mother and Father were deprived of services or access to the court—or where they were unaware of the Department's expectations or ongoing concerns. Moreover, there was no indication that there was any opposition to the delays in the review process. Accordingly, the court

28

treats the trial of this matter as an 18-month hearing of [A.] and [J.] governed by . . . section 366.22."

The court also found that there was no evidentiary support for the mother's contention that the social worker had an inappropriate " 'adoption agenda' " and ruled that the Department met its burden of establishing by clear and convincing evidence that reasonable reunification services had been offered to the parents. The court found that "[t]he services provided by the Department were tailored to Mother's needs, and were also adjusted to specifically accommodate her—as evidenced by the Department offering Mother one-on-one domestic violence counseling when she had problems getting along with her domestic violence facilitator due to what was perceived as a disruptive attitude and behavior in a group counseling setting."

### 2. Substantial Risk of Detriment

The court ruled that the Department met its evidentiary burden to show that return of A. and J. to the mother would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being, based on the court's findings with respect to domestic violence, substance abuse treatment, and the mother's conduct in driving while drowsy on a suspended driver's license.

*Domestic Violence Findings*

The court found that the relationship between the mother and R. remained volatile and "given Mother's minimization of the risks posed by exposing her very young children to this volatility, return of toddlers [A.] and [J.] to that home environment would place them at risk of both physical and emotional harm." Further, the court found that the evidence regarding the incident in which their father, B.R., killed the family's puppy showed that the mother did not have a realistic appreciation of the seriousness of the event and its impact on the children. The mother also continued to have contact with B.R., even after his physical and verbal abuse, and allowed him to have contact with her children in violation of a court order. The court found valid the social worker's

29

assessment that the mother did not understand domestic violence and would not be able to prevent it the future.

### *Substance Abuse Treatment*

The court found that the mother began methadone treatment as a result of her "addiction to painkillers, for which she faults over-prescribing doctors." The mother did not comply with the court's orders in J.'s case that she attend AA/NA meetings, obtain a sponsor, and participate in a substance abuse assessment or develop an aftercare relapse prevention plan. Rejecting the mother's contention that she did not need a substance abuse program because she was using legally prescribed medication, the court found that "this argument completely overlooks the fact that she sought Methadone treatment in the first place due to her dependency on the opioid-based painkiller, Norco."

Further, the court found it significant that the mother continued to fail to recognize a substance abuse problem or to comply with court-ordered substance abuse treatment even after the incident of May 9, 2012, when she drove drowsy with the children in the car. The court concluded, "[t]he persuasive weight of the evidence . . . supports the need for and reasonableness of the court-imposed substance abuse/relapse prevention conditions with which Mother undisputedly failed to comply. . . . [I]f for no other purpose than to better understand the potential effects of taking multiple medications contemporaneously."

### *Driving While Drowsy with a Suspended Driver's License*

The court found that the mother had admitted to driving with R., A. and J. although she did not have a valid driver's license and was violating a court order not to drive without a valid driver's license and insurance. The court also found credible Freitas' testimony that R. told him, during the Community Solutions intake interview, that the mother had been dozing off during the May 9, 2012 drive to Community Solutions, that her medication made her drowsy, and R. sometimes had to wake her up at stop lights and stop signs.

The court further found that "Mother's testimony left the impression that she felt it was okay for her to rest her eyes by closing them at a red light if [R.] was in the car—but not when the two youngest children were passengers.  At trial, Mother did not convey a genuine appreciation that such conduct was unsafe.  Apart from the issue of Mother's drowsiness, her decision to drive the children without a driver's license on May 9th was, in the words of Minor's Counsel . . . , ". . . just the most recent example of Mother's long history of poor choices.' "

The court also stated:  "The May 9, 2012 incident demonstrates that [A.] and [J.] are at risk of more than a mere possibility of harm.  This incident is significant not only because it created a perilous situation for [A.] and [J.]—and [R.], but it also serves to underscore Mother's continued unwillingness to be accountable for her actions or accept in a meaningful way responsibility for the impact of her actions on her children's physical safety.  Mother's reaction both minimized the incident and put blame on someone else for its occurrence.  . . .  [¶]  On multiple occasions, Mother's conduct has had the effect of sacrificing her children's physical safety and emotional welfare in favor of her own immediate needs."

## G.  *Findings and Orders*

The juvenile court issued its findings and orders on March 8, 2013, adopting all of the findings in the statement of decision and terminating reunification services and setting a section 366.26 permanency planning hearing.  The court also denied the mother's request to extend family reunification services to the mother under section 352 as there was no showing of good cause or any special circumstances to justify the extension.

## H.  *The Mother's Writ Petition*

The mother filed a petition for writ of mandate pursuant to California Rules of Court, rule 8.452,[4] in which she seeks a writ directing the juvenile court to vacate its

---

[4] All further references to rules are to the California Rules of Court.

orders of March 8, 2013, and to issue new orders either (1) returning A. and J. to her and providing her with family maintenance services; or (2) providing her with additional family reunification services. The mother contends that the trial court erred in setting a section 366.26 permanency planning hearing because there is no substantial risk of detriment in returning the children to her since (1) she has complied with the case plan; (2) there is no substantial evidence of domestic violence; (3) there is no substantial evidence that she has a substance abuse problem; and (4) there "have not been enough hearings" to support the finding of detriment.

## III.  DISCUSSION

Before evaluating the mother's contentions, we will provide an overview of the statutory requirements for the 18-month review hearing.

### A.  *18-Month Review Hearing*

"When a child is removed from a parent's custody, the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose of facilitating reunification of the family.  (§ 361.5, subd. (a).)" (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843 (*Tonya M.*).)  In *Tonya M.*, the California Supreme Court outlined the statutory scheme for providing reunification services, where, as here, the child was less than three years of age when removed from the parent's custody.  (*Id.* at p. 845.)

"The dependency scheme sets up three distinct periods and three corresponding distinct escalating standards for the provision of reunification services to parents of children under the age of three.  During the first period, which runs from roughly the jurisdictional hearing (§ 355) to the six-month review hearing (§ 366.21, subd. (e)), services are afforded essentially as a matter of right (§ 361.5, subd. (a)) . . . (§ 361.5, subd. (b))." (*Tonya M.*, *supra*, 42 Cal.4th at p. 845, fn. omitted.)

"During the second period, which runs from the six-month review hearing to the 12-month review hearing (§ 366.21, subd. (f)), a heightened showing is required to

continue services. So long as reasonable services have in fact been provided, the juvenile court must find 'a substantial probability' that the child may be safely returned to the parent within six months in order to continue services. (§ 366.21, subd. (e).)" (*Tonya M.*, *supra*, 42 Cal.4th at p. 845.)

"During the final period, which runs from the 12-month review hearing to the 18-month review hearing (§ 366.22), services are available only if the juvenile court finds specifically that the parent has 'consistently and regularly contacted and visited with the child,' made 'significant progress' on the problems that led to removal, and 'demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs.' (§ 366.21, subd. (g)(1)(A)-(C).) The effect of these shifting standards is to make services during these three periods first presumed, then possible, then disfavored. Additionally, because at each subsequent review hearing the court is statutorily obligated to reevaluate the propriety of future services under the new applicable standard for that hearing (§§ 361.5, subds. (a), (b), 366.21, subds. (e)-(g)), juvenile courts lack the authority to order services extending beyond the next review hearing." (*Tonya M.*, *supra*, 42 Cal.4th at p. 845.)

Thus, "[t]he absolute maximum period for services is 18 months (§ 361.5, subd. (a)), provided the court determines at both a six-month review hearing and a 12-month review hearing that continuation of services is warranted [citations]." (*Tonya M.*, *supra*, 42 Cal.4th at p. 843.) By statute, the 18-month permanency review hearing must occur "within 18 months of the date the child was originally taken from the physical custody of his or her parent or legal guardian." (§ 366.21, subd. (g)(1).) At the 18-month review hearing, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The

33

social worker shall the burden of establishing detriment." (§ 366.22, subd. (a); rule 5.720.)

Accordingly, " '[a]bsent extraordinary circumstances, the 18-month review hearing constitutes a critical juncture at which "the court must return children to their parents and thereby achieve the goal of family preservation or terminate services and proceed to devising a permanent plan for the children." [Citations.]' [Citation.] At this point, 'the focus of a dependency proceeding shifts to the child's needs for permanency and stability.' [Citation.]" (*V.C. v. Superior Court* (2010) 188 Cal.App.4th 521, 529.)

In the present case, the parties stipulated that the 18-month review period for both A. and J. had expired before the September 2012 trial took place. The parties also agreed at the time of trial that the September 2012 trial would be a combined 18-month review hearing for A. and J. that "essentially subsumed" the 6-month and 12-month review hearings that had not taken place. The mother nevertheless contends in her writ petition that her due process rights were violated because "no 12-month or 18-month reviews were held for [A.] and no six-month, 12-month or 18-month reviews were conducted for [J.]." We disagree, since the record reflects that the mother never objected to any of the continuances that caused the absence or delay of the interim review hearings in this case.

Our determination is based on section 352, subdivision (c), which provides: "In any case in which the parent . . . or minor is represented by counsel and no objection is made to an order continuing any such hearing beyond the time limit within which the hearing is otherwise required to be held, the absence of such an objection shall be deemed a consent to the continuance." Since the mother was represented by counsel and never objected, under section 352, subdivision (a) she is deemed to have consented to the many court orders in this case that continued the review hearings originally set for A. and J. Moreover, where, as here, the review hearings were continued beyond the maximum 18-month reunification period, it has been held that the delayed hearing becomes the 18-month permanency review hearing. (*Denny H.*, *supra*, 131 Cal.App.4th at p. 1509; see

also *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1420 [12-month review hearing was continued and heard with 18-month review hearing]; *In re Brian R.* (1991) 2 Cal.App.4th 904, 918 [12-month review hearing became 18-month hearing by virtue of passage of time]  The trial court therefore did not err in conducting the September 2012 trial as the 18-month permanency review hearing for both A. and J. under section 366.22.

We therefore turn to the mother's substantial evidence challenge to the trial court's finding at the 18-month review hearing that the return of the A. and J. to their mother would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being of the child.

**B.** *Substantial Risk of Detriment*

**1. Legal Standard**

As we have noted, section 366.22, subdivision (a) generally requires the juvenile court at the 18-month review hearing to return the child to the custody of the parent unless the court determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being.  (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).)  "In the absence of substantial evidence showing such detriment, the court is required to return the minor to parental custody.  [Citation.]"  (*Id.* at p. 1401.)

"The standard for showing detriment is 'a fairly high one.  It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.'  [Citation.]  Rather, the risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being.  [Citations.]"  (*Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1400.)

In determining whether it would be detrimental to return the child to the parent at the 18-month review, the juvenile court must consider whether the parent participated

35

regularly in and made substantial progress in a court-ordered treatment program, the "efforts or progress" of the parent, and the "extent" to which the parent "availed himself or herself of services provided." (§366.22, subd. (a); *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341 (*Jennifer A.*).) "The failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a).)

This court reviews the record to determine whether substantial evidence supports the juvenile court's finding that a child would be at substantial risk of detriment if returned to the parent's custody. (*Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1400-1401.) "[W]e consider the evidence favorably to the prevailing party and resolve all conflicts in support of the trial court's order. [Citation.]" (*Id.* at p. 1401.) Moreover, "[i]t is the trial court's role to assess the credibility of the various witnesses, [and] to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citations.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order. [Citations.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 (*Dakota H.*).)

### 2. Domestic Violence

The mother contends that the juvenile court's finding that A. and J. would be at substantial risk of detriment if returned to her custody is not based on substantial evidence. First, the mother argues that there is no substantial evidence to support the trial court's findings that A. and J. would be at risk due to their exposure to domestic violence in the home between her and R., her continued relationship with her abuser, and her minimization of and lack of understanding of the impact of domestic violence on young children. According to the mother, the evidence showed that R. had unsupervised

36

visitation with his younger brothers F. and P. and has not harmed them; R.'s relationship with her has improved; she has taken parenting classes and learned to handle R. better; and additional supervised visitation and reunification services would be a less restrictive manner of reducing any risk posed by R. to A. and J. The mother also argues that the evidence showed, contrary to the trial court's finding, that she understands and does not minimize the effect of domestic violence on children.

We find that substantial evidence supports the trial court's findings regarding the detrimental effect of domestic violence on A. and J. if they were to be returned to the mother's custody. As one appellate court has stated, " ' "D]omestic violence in the same household where the children are living . . . is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." [Citation.] Children can be put "in a position of physical danger from [spousal] violence" because, "for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg . . . ." [Citation.]' [Citation.]" (*In R.C.* (2012) 210 Cal.App.4th 930, 941-942.)

Here, the evidence showed that the mother lacked the ability to provide a violence-free home for A. and J. The mother and R., a teenager, had a longtime volatile relationship in the home that involved physical and verbal abuse, such that the mother had been afraid of him and had called for assistance from a truancy officer and her church bishop; the mother had continued her relationship with B.R., A. and J.'s father, even after he physically and emotionally abused her and killed the family's puppy while in a rage; the mother had allowed B.R. to have contact with her children in violation of a court order prohibiting him from contact with children as a registered sex offender; and the mother consistently minimized the domestic violence that had occurred in her household despite receiving services specifically directed to domestic violence, including parenting without violence education and individual domestic violence counseling. As the minors in their brief state, "[I]t is not [R.] that presents a bar to [A.] and [J.] returning home; it is

37

Mother's continued inability to provide a violence free home for them." Thus, even assuming that the mother has generally complied with her case plan, there is substantial evidence that she has not progressed sufficiently to ameliorate the domestic violence in her household. (See., e.g., *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141-1143.)

Further, it cannot be disputed, as the trial court found, that A. and J. are toddlers who would not be able to protect themselves from domestic violence. The detrimental effect of domestic violence was already apparent in A., who, the foster mother testified, was upset after being exposed to the mother and R.'s altercations.

In short, the mother's arguments regarding domestic violence lack merit because they depend upon the mother's view of the evidence. However, we uphold the court's findings if they are "supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence. [Citation.]" (*Dakota H.*, *supra*, 132 Cal.App.4th at p. 228.)

### 3. Substance Abuse

The mother argues that there was not substantial evidence to support the juvenile court's finding that there was a risk of detriment to A. and J. in returning them to the mother's custody because she did not comply with the court's orders in J.'s case that she participate in a substance abuse treatment program, even after the incident of May 9, 2012, when the mother drove with R., A., and J. in the car while she was experiencing drowsiness as a side effect of her medication. The mother asserts that the juvenile court inconsistently required her to participate in substance abuse programs in A.'s case, but not in J.'s case. She also argues that the evidence shows that she does not have a substance abuse problem since she "*has never tested dirty once*" for illegal substances during the juvenile dependency cases and she has maintained sobriety. The mother also relies on the decision in *Jennifer A.*, *supra*, 117 Cal.App.4th 1322 for the proposition that there is not substantial evidence of a drug problem where the parent has not been diagnosed as having a substance abuse problem.

The Department disagrees, noting that section 366.22, subdivision (a) provides that "[t]he failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a).) It is undisputed that the mother expressly declined to participate in the court-ordered substance abuse treatment program in J.'s case because she did not believe that she had a substance abuse problem. Under section 366.22, subdivision (a), therefore, the mother's refusal constitutes prima facie evidence that return of A. and J. to her custody would be detrimental.

Moreover, substantial evidence supports the juvenile court's finding that, due to the mother's use of legal drugs and her refusal to participate in the court-ordered drug treatment programs, there would be a substantial risk of detriment to A. and J. in returning them to the mother's custody. The incident of May 9, 2012, is a significant example of the detriment resulting from the mother's legal drug use. On that day, the mother, who did not have a driver's license, drove her car to R.'s Community Solutions appointment with A. and J. as passengers although she was experiencing drowsiness as a side effect of taking Cymbalta. R. had to wake her up at stop signs and stop lights, and she was too drowsy during the Community Solutions intake process to stay awake and to pay attention to A., who was dumping all the toys and turning the office lights on and off, or to J., who was crying. Also during the daytime, the mother had dozed off more than once in the presence of the foster mother and on another occasion had to be roused from sleeping when the foster mother arrived to pick up A. and J. Substantial evidence therefore supports the juvenile court's finding that "[t]he persuasive weight of the evidence . . . supports the need for and reasonableness of the court-imposed substance abuse/relapse prevention conditions with which Mother undisputedly failed to comply. . . . [I]f for no other purpose than to better understand the potential effects of taking multiple medications contemporaneously."

#### 4. Lack of Interim Hearings

Finally, the mother contends that "there have not been enough hearings" to support the finding of substantial detriment if A. and J. are returned to her care. She explains that the interim review hearings for A. and J. did not take place in a timely fashion in A.'s case or at all in J.'s case; the case plans for A. and J. were inconsistent, which gave the mother "a mixed message"; she had reunification services for "an unheard of thirty four months"; and the Department "has varied their position a number of times on whether or not to return the children to Mother's care." The mother does not challenge the juvenile court's finding that the Department provided reasonable reunification services to her.

We understand the mother to argue that there were procedural irregularities in the cases of A. and J., since not all interim review hearings were held, that preclude a finding of substantial detriment under section 366.22, subdivision (a). This argument is not convincing. We reiterate that section 352, subdivision (c), provides that "[i]n any case in which the parent . . . or minor is represented by counsel and no objection is made to an order continuing any such hearing beyond the time limit within which the hearing is otherwise required to be held, the absence of such an objection shall be deemed a consent to the continuance." As we have discussed, it is undisputed that the mother did not object to any of the orders continuing the interim review hearings in the cases of A. and J.; therefore, under section 352, subdivision (c), the mother is deemed to have consented to the continuances. The mother also agreed at the time of trial that the September 2012 trial would be conducted as the 18-month permanency review hearing under section 366.22.

Thus, the issue properly before us is whether, at the 18-month permanency review hearing held in September 2012, substantial evidence supports the juvenile court's finding that return of A. and J. to the mother would create a substantial risk of detriment to their physical or emotional well-being. (See *Yvonne W.*, *supra*, 165 Cal.App.4th at

40

p. 1400.) Having determined that substantial evidence supports the juvenile's finding of detriment, and there being no challenge to the reasonableness of the reunification services provided to the mother, we conclude that the trial court did not err in terminating the mother's reunification services and setting a section 366.26 permanency planning hearing for A. and J. Having reached this conclusion, we will deny the mother's writ petition without addressing the issue of whether the juvenile court erred in denying the mother's request for a continuance of the 18-month permanency review hearing and the extension of reunification services. (§ 366.22, subd. (b); § 352.) We will also deny her stay request as moot.

## IV. DISPOSITION

The petition for writ of mandate is denied. The request for a stay of the Welfare and Institutions Code section 366.26 hearing, presently set for July 3, 2013, is denied as moot.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
MIHARA, J.

41